J-S15012-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| MARC ANTHONY ARNOLD | |
| Appellant | No. 1884 EDA 2016 |

Appeal from the PCRA Order May 27, 2016
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0003221-2010

BEFORE:  BOWES, J., DUBOW, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY BOWES, J.:                      **FILED JUNE 27, 2017**

Marc Anthony Arnold appeals from the May 27, 2016 order denying him PCRA relief.  We affirm.

Appellant was charged with criminal homicide stemming from the shooting of Kevin Cobbs, Jr. at Philly's Sports Bar on April 7, 2010.  The events leading up to the shooting, as well as the fatal shooting, were depicted on videotape.  Appellant arrived at the bar with three other men at approximately 12:34 a.m.  They entered through the rear door.  Appellant stopped and spoke to Kevin Cobbs, Jr., the victim, who was his superior in the Bloods street gang.  The two men soon exited the bar with another man identified as Dwight Boase.  Appellant and Cobbs began arguing in the parking lot, and shortly thereafter, one of the men who had accompanied

Appellant approached them. Cobbs reached for his waistband, and Appellant and his cohort grabbed Cobbs and wrestled with him. The physical struggle ended shortly after Boase pulled a handgun from his waist.

Appellant and Cobbs continued to argue, and the two other men who had accompanied Appellant joined the verbal altercation outside. The video showed Cobbs and the others disengaging from the altercation, walking toward the entrance of the bar, and entering. In the meantime, Appellant went to the car, retrieved a handgun, held it behind his back, and ran towards the bar entrance. Appellant reached into the entryway of the bar and started shooting in Cobbs' direction. After he emptied his weapon, Appellant returned to the vehicle, entered the front passenger seat, and departed. After Cobbs collapsed in the bar from a gunshot wound, his cousin removed a loaded .22 caliber weapon from him and discarded it in a trash can. Cobbs died due to the gunshot.

Appellant fled to Virginia Beach, where he was apprehended on April 10, 2010. A search of his hotel room pursuant to a warrant yielded the murder weapon. He waived his **Miranda** rights and confessed to shooting Cobbs. He told police that, when he told Cobbs that he wanted to quit the Bloods, Cobbs threatened him and his mother, and displayed a weapon.

Appellant's initial counsel, Chief Public Defender Earl C. Supplee, filed a notice of insanity defense on behalf of Appellant on September 30, 2010, based on an evaluation by forensic psychiatrist Susan E. Rushing, M.D., J.D.[1] The Commonwealth filed a notice of its intent to seek the death penalty and of the aggravating circumstances at issue. Public Defender Supplee subsequently withdrew from the case and Attorney Christopher Shipman was appointed to represent Appellant. The Commonwealth had two experts who, after evaluating Appellant, authored reports and were prepared to testify that Appellant was not legally insane at the time of the shooting. On September 18, 2012, Appellant pled guilty to one count of criminal homicide generally, in return for the Commonwealth's agreement not to seek the death penalty.

The trial court immediately proceeded to conduct a degree of guilt hearing, which lasted four days. Appellant testified that he was diagnosed at age eight with schizophrenia, manic depression, and psychosis. N.T. Degree of Guilt Hearing, 9/25/12, at 31. On the date of the shooting, he was not taking any medications that had been prescribed for his mental health

---

[1] Dr. Rushing opined: "To summarize, it is my psychiatric opinion, expressed within medical certainty, that at the time of the commission of the offense, Marc Arnold was laboring under such a defect of reason, from a disease of the mind, that he did not know that what he was doing was wrong, consistent with the requirements of 18 Pa.C.S. § 315(b)." Expert Report, 1/3/12, at 12.

issues. He testified that the victim, his superior in the Bloods gang, had ordered him to stop taking his prescribed medications because they made Appellant too calm. At the time of the hearing, Appellant was taking Remeron, Thorazine, Depakote and Risperdal, which he was prescribed after he went to Lehigh Prison.

At the degree of guilt proceeding, trial counsel Shipman and Appellant pursued defenses of heat of passion and imperfect self-defense. Appellant testified that he first became involved in the Bloods gang when he was about sixteen years old. *Id*. at 35. At first, he thought it was "like a clubhouse type thing," *id*. at 36, but later learned that "it was all about drugs, guns and putting in work." *Id*. "Putting in work" meant "selling drugs, fighting, killing people, anything." *Id*. at 37. He answered to Kevin Cobbs, the victim herein, and Cobbs dictated what tattoos he would get and directed the "work." Appellant testified that he was directed to drop out of community college because it was "interfering with Blood business." *Id*. at 41.

At the time of the shooting, Appellant had not seen Cobbs for approximately one month. Appellant narrated the following version of the events depicted on the videotape. Upon seeing Cobbs in the bar, Appellant gave him the Blood handshake, explained why he had not been involved in the gang, and why he no longer wanted to be in the gang. The victim led him outside to the middle of the parking lot and told him that he was not

leaving the gang. Cobbs allegedly told Appellant that, "the only way you leave is in a body bag." *Id*. at 57. The victim threatened to kill Appellant and his mother, issuing the veiled threat that he knew where Appellant's mother lived. Cobbs put his hand to his waist as if he had a gun. Others joined the altercation and guns were drawn. Appellant and his victim struggled over the victim's gun and, Appellant testified that the victim held a gun to his head. The situation de-escalated when the parties realized that there was a camera capturing the scene.

Appellant testified that he walked to the car, angry and fearful that the victim was going to kill him and his family. *Id*. at 67. The video depicted Appellant yelling and waving his arms at the victim. He entered the car, retrieved a gun, and returned running and shooting. He emptied all six bullets from his weapon into the bar after the victim and the others had returned to that establishment. He contended that he shot Cobbs in the heat of passion due to his paranoia and psychosis and in response to Cobbs' threats. He testified that he was hearing voices and that he was lost at the time.

Appellant presented Frank M. Dattilio, Ph.D., a clinical and forensic psychologist, who had originally been retained by the Commonwealth. He

confirmed that Appellant had a long history of mental illness,[2] that he was acting under the influence of those problems at the time, and that he believed that he and his mother were in danger. The Commonwealth offered the opinion testimony of Timothy J. Michals, M.D., a clinical and forensic psychiatrist, to the effect that Appellant's conduct was the result of the argument with Cobbs, not his mental illness, and that he was not legally insane at the time of the crime.

The trial court concluded that Appellant acted with malice when he fired multiple gunshots into the crowded bar in the direction of the victim, but that he did not act with a specific intent to kill. It rejected Appellant's claim that he reasonably thought he was acting in self-defense. It noted that Appellant had an opportunity to leave, and instead, he retrieved the gun, ran after the victim, and started shooting. Consequently, the trial court found Appellant guilty of third-degree murder, and sentenced him to twenty to forty years imprisonment.

After his post-sentence motion was denied, Appellant filed a direct appeal to this Court at 299 EDA 2013, challenging the sufficiency of the evidence and the excessiveness of his sentence. This Court denied his

---

[2] Dr. Dattilio indicated that as Appellant grew older, there was some question whether he actually had a "schizoaffective disorder, bipolar type, or whether he had a psychotic disorder, not otherwise specified." N.T. Degree of Guilt Hearing, 9/28/12, at 11.

appeal on March 7, 2014.[3] **Commonwealth v. Arnold**, 100 A.3d 298 (Pa.Super. 2014) (unpublished memorandum). A timely petition for allowance of appeal was denied on August 25, 2014. **Commonwealth v. Arnold**, 99 A.3d 75 (Pa. 2014).

On July 10, 2015, Appellant filed the instant *pro se* PCRA petition, counsel was appointed, and counsel filed an amended petition on Appellant's behalf. Appellant maintained that his guilty plea was not knowing, voluntary or intelligent because he relied on counsel's misrepresentation that he could only pursue an insanity defense after he pled to homicide.

A hearing was held on the petition on December 22, 2015. The Commonwealth stipulated to the admission of the January 3, 2012 psychiatric expert report of Dr. Susan Rushing, and that she would have been available at trial to offer testimony consistent with that report. Appellant testified that his attorney, Christopher Shipman, advised him that he had Dr. Rushing's report and they discussed whether to pursue an insanity defense based on the report. According to Appellant, Attorney Shipman advised him that he could not proceed with an insanity defense at a jury trial, but that the insanity defense would be asserted after he pled

---

[3] It appears from the record that Appellant filed a series of motions: motion for mandamus, omnibus motions, "Notice to the Courts" on July 18, 2014, which the trial court treated as a PCRA petition, and which it dismissed without prejudice due to the pending direct appeal.

guilty to homicide generally. Appellant testified that he only entered the guilty plea based upon that representation. Appellant maintained that, if he had known that insanity was a complete defense that should be raised at trial, he would have gone to trial. N.T. PCRA Hearing, 12/22/15, at 13.

Appellant testified further that Mr. Shipman told him he was not bringing Dr. Rushing to trial, only Dr. Dattilio. On cross-examination, Appellant acknowledged that he was aware of and had read both the reports of Dr. Dattilio and the Commonwealth's expert, Dr. Michals. Even though Dr. Dattilio opined that Appellant was not legally insane when the crime was committed, Appellant disagreed that Dr. Dattilio expressed that opinion. *Id*. at 15. Appellant also maintained that he informed the court "multiple times" during the degree of guilt hearing, and again in a post-sentence motion, that he wanted to pursue an insanity defense. *Id*. He only agreed to pursue a self-defense claim because Mr. Shipman purportedly told him that, "insanity and self-defense were one and the same." *Id*. at 17.

Attorney Christopher Shipman testified that he had handled more than one hundred criminal cases and was death-penalty certified. An insanity defense was involved in two or three of those cases. Mr. Shipman reviewed the reports prepared by Susan Rushing, Ph.D. and Dr. Frank M. Dattilio, which reached different conclusions about whether Appellant was legally insane. He believed that Dr. Dattilio's report was more detailed and

thorough, and furthermore, it was consistent with the Commonwealth's expert psychiatrist's opinion that Appellant was not legally insane.

Counsel testified that, after reviewing all of the reports with Appellant multiple times, he did not believe Appellant's insanity defense was viable. Trial counsel apprised Appellant that, even if he was successful in pursuing that defense, he could be indefinitely committed to a mental hospital. Counsel stated that he told Appellant that, if he agreed to plead guilty to homicide generally, he could not pursue the insanity defense. However, the Commonwealth had also agreed not to seek the death penalty if he pled guilty.

According to Mr. Shipman, he and Appellant came to the consensus that imperfect self-defense was more consistent with the videotape evidence, the taped statement Appellant gave to police when he was apprehended, and what he told the three mental health experts. It offered a better chance of success.[4] Counsel believed that Appellant understood the differences between the two defenses when he opted to plead guilty to the

_____

[4] Dr. Dattilio opined at the degree of guilt hearing, consistent with his report that, due to "his psychotic illness and paranoia and the entire situation was magnified, . . . he clearly believed that he was going to die and his family was going to die. . . . It was self-defense for him." N.T. Degree of Guilt Hearing, 9/28/12, at 23. He testified further that he believed Appellant's "intention was to scare and not to kill." **Id**.

homicide charge and pursue imperfect self-defense.[5]  N.T. PCRA Hearing, 12/22/15, at 24.  Counsel was hoping to achieve a finding of guilt as to manslaughter based on imperfect self-defense.

The PCRA court denied relief and Appellant timely filed the instant appeal.  He complied with the court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and he presents one issue for our review:

> Did the trial court err in finding that trial counsel provided effective assistance for the following reasons: Petitioner's plea was not knowing, voluntary, or intelligent because trial counsel was ineffective for failure to pursue a viable insanity defense by telling Petitioner that he could pursue such a defense only after the entry of a plea to murder generally[?]

Appellant's brief at 4 (unnecessary capitalization omitted).

Our standard of review from the denial of post-conviction relief "is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error." *Commonwealth v. Watley*, 153 A.3d 1034, 1039 (Pa.Super. 2016).  We "will not disturb findings that are supported by the record."  *Id*. at 1040.

---

[5]  Homicide consists of murder, voluntary manslaughter, or involuntary manslaughter.  *See* 18 Pa.C.S. § 2501.  A killing in the sudden heat of passion resulting from serious provocation is voluntary manslaughter.  18 Pa.C.S. § 2503(a).  Imperfect self-defense involves an unreasonable belief by the perpetrator that an intentional or knowing killing was justified, and will reduce the grading of a homicide from murder to voluntary manslaughter.  18 Pa.C.S. § 2503(b)

Where, as here, the allegation is one of trial counsel's ineffectiveness, the following principles inform our review. Counsel is presumed to be effective and in order to overcome that presumption, the petitioner must demonstrate that:

> (1)   the underlying substantive claim has arguable merit;
>
> (2)   counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and
>
> (3)   the petitioner suffered prejudice as a result of counsel's deficient performance.

*Commonwealth v. Ligons*, 971 A.2d 1125, 1137 (Pa. 2009). In order to obtain relief on an ineffectiveness claim, a petitioner must establish each of the prongs. With regard to the second "reasonable basis" prong specifically, the petitioner must prove that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Watley*, *supra* at 1040 (quoting *Commonwealth v. Spotz*, 18 A.3d 244, 260 (Pa. 2011).

Appellant proceeded on two theories that, if successful, would result in a conviction of manslaughter. Although the trial court found Appellant guilty of third-degree murder, the PCRA court concluded that counsel "certainly chose a reasonable strategy in pursuing a theory of self-defense rather than insanity." PCRA Court Opinion, 5/27/16, at 4.

Appellant argues that his plea was not knowing, intelligent or voluntary because he entered the plea based on counsel's misrepresentation

that the insanity defense could be pursued only after entry of a plea to murder generally. Appellant's testimony in this regard was directly contradicted by trial counsel's testimony, and the trial court expressly found counsel to be credible. PCRA Court Opinion, 5/27/16, at 3 n.1. Counsel maintained that he discussed the viability of both the insanity defense and self-defense with Appellant several times. Both agreed that the better course was to plead guilty to homicide generally and remove the death penalty from consideration. Appellant could then pursue imperfect self-defense in an effort to reduce his degree of guilt from murder to manslaughter. Although Appellant ultimately did not prevail on the imperfect self-defense theory, he succeeded in persuading the trial court that there was no intent to kill, resulting in a conviction of third-degree murder.

Since counsel testified that he advised Appellant that if he pled guilty, he could not pursue an insanity defense, and the PCRA court credited counsel's testimony, we find no factual support for Appellant's claim. In addition, the record establishes that the trial court, as part of its guilty plea colloquy, thoroughly explained to Appellant the effect of pleading guilty to murder. N.T. Degree of Guilt Hearing, 9/18/12, at 16-17.

The trial court confirmed Appellant's understanding that "[u]pon your plea of guilty to murder generally, you can be found guilty of murder in the first degree, murder in the second degree, murder in the third degree,

voluntary manslaughter or involuntary manslaughter." **Id**. The trial court explained the penalty for each of the offenses. The court also advised Appellant that, by pleading guilty, he was giving up his right to challenge the court's ruling on the admissibility of his video statement, but that he could still challenge his plea as involuntary or unknowing, a lack of jurisdiction, or an illegal sentence. **Id**. at 28.

Appellant verified that he was satisfied with his attorney and that no one promised him anything or used any force to induce his guilty plea. **Id**. at 30. The court explained in detail the elements of each degree of murder and manslaughter, and went on to define malice and heat of passion. Appellant also acknowledged that he had completed a written guilty plea colloquy form and that he understood all the questions and answered them truthfully. **Id**. at 43. He executed the form in the presence of the court, and the court accepted the plea.

At the beginning of each day of the degree of guilt hearing, the trial court directed that Appellant be sworn, asked whether he had any questions, and whether he understood what was going to happen. In each instance, Appellant responded affirmatively. The Court also questioned whether Appellant was "maintaining your plea of guilty to criminal homicide generally, and you understand that at the end of these proceedings, I will determine the degree of guilt, whether murder of the first degree, murder of the third degree, or voluntary manslaughter." N.T. Degree of Guilt Hearing,

9/25/12, at 6. Appellant professed his understanding and had no questions.[6] The record is replete with evidence that Appellant understood the consequences of his plea and entered it knowingly and intelligently.

Furthermore, as the PCRA court found, counsel's strategy had a reasonable basis. An insanity defense offered minimal likelihood of success in light of the expert testimony. Moreover, in order to pursue it, Appellant would have been exposed to the death penalty and commitment to a mental health facility. By foregoing the defense and entering the plea, Appellant could avail himself of the testimony of Dr. Dattilio to mitigate guilt.

After a thorough review of the record, we find ample support for the PCRA court's conclusion that trial counsel had a reasonable basis for his strategy. Counsel evaluated the psychiatric experts and concluded that the wiser course was to forego the insanity defense, enter the plea to general homicide, and focus on proving imperfect self-defense. The court credited counsel's testimony that he communicated this strategy to Appellant and that Appellant understood that, as a consequence of pleading guilty, he could not pursue an insanity defense. The record before us amply supports

_____

[6] Appellant testified at the PCRA hearing that he advised the court "multiple times" during the degree of guilt hearing that he wished to pursue an insanity defense. N.T. PCRA Hearing, 12/22/15, at 15. The record of the degree of guilt hearing belies Appellant's representation.

the PCRA court's conclusion that trial counsel was effective in his representation of Appellant, and no relief is due.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/27/2017